**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHECKER CAR CLUB OF AMERICA, INC., an Indiana corporation, | |
| PLAINTIFF, | |
| v. | Case No. 17-cv-01865 |
| JOSEPH FAY, an individual, d/b/a CHECKER CAB CLUB, | JURY TRIAL DEMANDED |
| DEFENDANT. | |

## COMPLAINT

Plaintiff, CHECKER CAR CLUB OF AMERICA, INC. ("Checker Car Club" or "Plaintiff"), by and through its undersigned counsel, hereby brings this Complaint against Defendant JOSEPH FAY d/b/a CHECKER CAB CLUB ("Defendant" or "Checker Cab Club"). In support thereof, Plaintiff states as follows:

## NATURE OF THE ACTION

1.     This is an action for unfair competition under the Lanham Act (15 U.S.C. § 1125(a)); fraudulent registration under the Lanham Act (15 U.S.C. § 1120); violation of the Anti-Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)); violation of the Uniform Deceptive Trade Practices Act (815 ILCS § 510/1 *et seq.*); and tortious interference with contractual relations under Illinois common law.

## JURISDICTION AND VENUE

2.     Subject matter jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1121 (actions arising under the Lanham Act); 28 U.S.C. § 1331 (actions arising under the laws of the United

States); 28 U.S.C. § 1338(a) (actions arising under an Act of Congress relating to trademarks); and 28 U.S.C. § 1338(b) (actions for unfair competition related to trademarks).

3.      This Court has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. § 1367(a).

4.      This Court has personal jurisdiction over the Defendant because (i) Defendant resides in this forum; (ii) Defendant has committed tortious acts within this forum; and, (iii) Defendant's tortious conduct has targeted persons in this forum.  Specifically, Defendant has advertised and offered services under infringing service marks from this forum and to third parties within this forum.  He has also unlawfully copied and distributed trademarked newsletters to third parties in this forum.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)–(3) because a substantial part of the events giving rise to the claims in this action occurred within this District and/or Defendant is subject to personal jurisdiction herein.

## THE PARTIES

6.      Plaintiff is a 501(c)(7) Indiana corporation with a principal place of business at 2424 South Pasfield St., Springfield, IL 62704-4609.

7.      Upon information and belief, Defendant Joseph Fay is an individual residing in Naperville, Illinois.  Upon information and belief, Defendant does business as "Checker Cab Club," an unincorporated Illinois entity with a principal place of business located in Naperville, Illinois.

## FACTUAL BACKGROUND

8.      In July of 1982, Checker Motors Corporation of Kalamazoo, Michigan discontinued production of its beloved "Checker" automobiles.

2

9.     As a result, Don McHenry, along with a number of Checker Motor Corporation employees, founded Checker Car Club of America ("Checker Car Club") in April of 1982. Affidavit of James P. Garrison ("Garrison Aff.") ¶ 5.  The organization's original and ongoing mission is to promote the preservation, enjoyment, and exchange of information about Checker automobiles.  Affidavit of Mark Lohsen ("Lohsen Aff.") ¶ 5.

10.    Since 1984, Checker Car Club has provided its members a quarterly newsletter, administered discount purchasing programs, facilitated car-part information exchanges, and organized exclusive club events—such as car shows, museum tours, and annual conventions. Lohsen Aff. ¶ 7.

11.    Since that time, Checker Car Club has used its "CHECKER CAR CLUB OF AMERICA" service mark in connection with the above-described services.  Garrison Aff. ¶ 5; Combined Exhibit 1.  Since August of 1984, Checker Car Club has also used the shortened "CHECKER CAR CLUB" mark to signify the source of the same services.  Lohsen Aff. ¶ 7; Combined Exhibit 2.  Since 1984, Checker Car Club has also used its CHECKERBOARD NEWS mark for its series of newsletters.  Combined Exhibit 2.

12.    By 1984, Checker Car Club had members from over 20 U.S. states and Canada.  Lohsen Aff. ¶ 8.  By 2000, Checker Car Club was offering its services to all fifty states and several other foreign nations.  Lohsen Aff. ¶ 8.

13.    Checker Car Club was formally incorporated in the State of Indiana on August 24, 2000. *See* Exhibit 3.  It was granted tax exempt status as a 501(c)(7) organization by the Internal Revenue Service on June 25, 2002.  *See* Combined Exhibit 4.

14.    Like many non-profit organizations, Checker Car Club never federally registered its CHECKER CAR CLUB OF AMERICA service mark, its CHECKER CAR CLUB service mark,

or its CHECKERBOARD NEWS trademark ("the Checker Car Club Marks"). Nevertheless, it has continuously and substantially exclusively used the Checker Car Club Marks and the CHECKERBOARD NEWS mark to indicate the source of its services since at least 1984. Garrison Aff. ¶ 5; Lohsen Aff. ¶ 7.

15.     Indeed, over the last thirty-five years, Checker Car Club has expended substantial time, money, and other resources developing, advertising, and otherwise promoting its Checker Car Club Marks. Combined Exhibit 5.

16.     Through this continuous and substantially exclusive use, Checker Car Club has long since acquired secondary meaning in its Checker Car Club Marks: Every Checker automobile enthusiast knows "Checker Car Club" or "Checker Car Club of America" and what it stands for.

17.     Over the last three decades, Checker Car Club and its marks have appeared in nationally published print media, including Money Magazine®, Hemming Motor News®, and the Kalamazoo Gazette®; nationally broadcasted television shows, including Good Morning America® and Fox News®; radio programs like The Taxi Dave Show; and, countless public car shows and websites. Lohsen Aff. ¶ 9.

**Defendant and Checker Car Club**

18.     In 2000, Defendant joined Checker Car Club. Lohsen Aff. ¶ 10. In 2004, Defendant became President of Checker Car Club. Lohsen Aff. ¶ 10.

19.     In July of 2004, as part of the organization's new web strategy, Checker Car Club contracted with Division Point Multimedia to provide its club and information services through the website <www.checkertaxistand.com> ("the Taxi Stand Website"). Garrison Aff. ¶ 9; Exhibit 6. On the "CCCoA tab" on the Taxi Stand Website, Checker Car Club members (using a

password) could log in to the Checker Car Club portal and access the club's newsletters, pictures, and event materials. Non-members could not access the portal. Lohsen Aff. ¶ 13.

20.     While President, Defendant exhibited a conspicuous disdain with the corporate structure of the non-profit organization: He did not care for budgets, board meetings, or board approval. Lohsen Aff. ¶ 14.

21.     In September of 2006, Defendant resigned as President from Checker Car Club for health reasons. However, Defendant remained a Director of Checker Car Club until 2009 and remained a member of Checker Car Club until 2011 (he again became a member in 2013 and 2014). Lohsen Aff. ¶ 10.

22.     In 2008, two years after Defendant resigned as President of Checker Car Club and while he was still a Director of the organization, Defendant created a Facebook Group called "Facebook Checker Cab Group" (Defendant has also referred to the Group as "Checker Cab Group" and "Checker Cab Facebook Group"). Garrison Aff. ¶¶ 8, 10; Exhibit 7.

23.     Checker Car Club was aware of and permitted Defendant's use of this Facebook Group because the Group was sufficiently different from the CHECKER CAR CLUB and CHECKER CAR CLUB OF AMERICA marks and because Defendant—a Director of Checker Car Club at the time—was still given the benefit of the doubt that he was in good faith trying to advance the organization's mission. Garrison Aff. ¶¶ 8, 10.

24.     After receiving multiple complaints from members (including Defendant), Checker Car Club board members—at the annual meeting after the June 2014 convention—decided that the organization needed to establish a stronger online presence in the form of its own, independent website and Facebook page. Garrison Aff. ¶¶ 12–14.

25.     Also in June of 2014, Checker Car Club Secretary John Weinhoeft explicitly told Defendant to stop loading the most recent Checker Car Club newsletters on Defendant's Facebook Group.  Defendant pretended to abide, but then continued to load every issue of the Checker Car Club newsletter shortly after each was published.  Lohsen Aff. ¶ 11–12.

26.     In July and August of 2014, George Laszlo (webmaster of Checker Car Club website) enlisted the help of Checker Car Club members Michael Pincus and Defendant (who rejoined the organization in 2013) to develop a strategy to boost Checker Car Club's web presence.  Garrison Aff. ¶ 9.

27.     Checker Car Club's initial plan was to build a new website and redesign Defendant's existing Facebook Group to use as Checker Car Club's primary social media account.  Garrison Aff. ¶ 9.

28.     However, by August of 2014, Checker Car Club webmaster George Laszlo and Defendant agreed that Checker Car Club would have to build its social media accounts, entirely independent of Defendant and Defendant's Facebook Group.  Garrison Aff. ¶ 12; Exhibit 8.

29.     In November of 2014, Checker Car Club President Jim Garrison tried one last time to work with Defendant by discussing a cross-link between Checker Car Club's Taxi Stand Website and Defendant's Facebook Group (while Checker Car Club was developing its own website). However, Defendant's scurrilous attacks on members of his Facebook Group prompted Mr. Garrison to consult with other Checker Car Club members and ultimately decide to not work with Defendant.  Garrison Aff. ¶¶ 13–14.

30.     On June 27, 2015, Checker Car Club introduced its new website <www.checkerworld.org> and new Facebook Page (titled "Checker World") at the

organization's Board meeting following its annual convention in South Bend, Indiana in June of 2015.  Garrison Aff. ¶ 15.

31.    Defendant attended the Board meeting and was furious that Checker Car Club developed its own website and Facebook Page.

32.    Shortly after Plaintiff's new website's launched, Plaintiff began noticing that large amounts of data were being downloaded from its website—along with verbatim posts from its Facebook Page—that thereafter appeared on Defendant's Facebook Page.  Lohsen Aff. ¶¶ 11–12.

33.    As a result of Defendant's unlawful appropriation from Plaintiff, as well as various critical remarks about Plaintiff, the Checker Car Club Board revoked Defendant's membership on July 8, 2015.  Lohsen Aff. ¶ 12.

**Defendant's Retaliation**

34.    On July 29, 2015, in retaliation to his expulsion, Defendant registered the domain name <www.checkercabclub.org>.  *See* Exhibit 9.   Defendant purposely chose "Checker Cab Club" because it is virtually identical to Plaintiff's widely-recognized "Checker Car Club" name and service mark.

35.    In September of 2015, Defendant Fay contacted Google, Inc. and asserted fabricated copyright claims against Plaintiff.  *See* Exhibit 10.  Google, Inc. then contacted Wix.com, Inc. (the webhost provider of Checker Car Club's website) and Wix, Inc. promptly shut down Plaintiff's website until Plaintiff provided Wix, Inc. with documentation discrediting Defendant's bogus and bad-faith copyright accusations.  *See* Exhibit 11.   The shutting down of Plaintiff's website caused extensive damage and embarrassment to Plaintiff's brand and business.

36.     In October of 2015, without authorization from Checker Car Club, Defendant copied, publicly posted, and permitted users of his website and Facebook Page to download all of Checker Car Club's copyrighted newsletters.  Defendant did this despite the fact that the Terms and Conditions of Plaintiff's website made it clear that any member's downloading of newsletters (which can only be done through a members-only login portal) must be for "personal use" only.  *See* Exhibit 12.

37.     Defendant did this despite purported advice from his lawyer to "break the link with [Checker Car Club]."  *See* Exhibit 13.

38.     In November 14, 2015, Defendant announced his flagrantly infringing "checkercabclub.org" website.  *See* Exhibit 14.   Defendant included a double-flag symbol as a logo on checkercabclub.org that is nearly identical to Checker Car Club's double-flag symbol, overlaid upon a similar circular design:

     

(Plaintiff's Logo)          (Defendant's Infringing Logo)

*See* Exhibit 15.

39.     In response, the Checker Car Club Board began discussing legal and non-legal measures available to address Defendant's tortious actions.

40.     Then, on December 11, 2015, and without authorization from Checker Car Club, Defendant filed a federal trademark application for "CHECKER CAB CLUB" for "organizing

chapters of a taxi cab club and promoting the interests of the members thereof" and "promoting the interests of people involved and concerned with historical taxi cabpreservation [*sic*]." *See* Exhibit 16.

41.     In his signed trademark application, Defendant (1) did not disclose to the USPTO the existence of the original Checker Motors Corporation, (2) did not disclose the existence (and priority of) of the Checker Car Club Marks even though the included Specimen RFA0005 clearly shows a disclaimer of his association with Checker Car Club, and (3) misrepresented the first date he used the mark in commerce, "as early as November 19, 2008," despite the fact that <checkercabclub.org> was announced on November 14, 2015. *See* Exhibits 14, 17.

42.     On March 31, 2016, the UPSTO examining attorney refused registration of Defendant's mark because it was deemed "merely descriptive" and because Defendant's specimen did not show the CHECKER CAB CLUB mark being used in commerce but instead showed the following phrases: "WELCOME TO THE LARGEST FREE ONLINE CHECKER CAB CLUB" and "WELCOME TO THE ONLINE CHECKER CAB CLUB GROUP." *See* Exhibits 15, 17– 18.

43.     On July 1, 2016, Defendant signed an Office action response that stated he had used the CHECKER CAB CLUB mark "[a]t least as early as 11/19/2008" and that the new specimen that he submitted with the Office action response "was/were in use in commerce at least as early as the filing date of the application." *See* Exhibit 19.

44.     Both of these material statements were false:  While Defendant started using the names "Checker Cab Facebook Group" on his Facebook page in 2008, he did not began using "Checker Cab Club" until he launched his website in late 2015 or early 2016—and not "in interstate

commerce" until he altered his website in response to the Office action on June 30, 2016. *See* Exhibit 20.

45. While Defendant awaited registration of his infringing mark, he created a series of fake accounts on Facebook (including "Lester Johnson" and "Rodney Pressler") in order to post false and disparaging comments about Checker Car Club and its officers. *See* Combined Exhibit 21.

46. On October 25, 2016, Defendant received his fraudulently-procured registration for CHECKER CAB CLUB and proceeded to use it to shut down Checker Car Club's Facebook Page by filing a complaint with Facebook, Inc. against Plaintiff on October 26, 2016. *See* Exhibit 22.

47. On October 27, 2017, Defendant then created a new "Checker World" Facebook Group (ID 334757523558519), egregiously copying Checker Car Club's "Checker World" Facebook Group (ID 1384634708513474). *See* Exhibits 23–24.




Pl.'s Checker World Page      Def.'s Infringing Checker World Page
(Ex. 26)      (Ex. 25)

48. Defendant explicitly stated his nefarious intention in creating the copycat Facebook page: "Our intent is to integrate Checker World members into our club." *See* Exhibit 25.

49. On January 11, 2017, Plaintiff finally filed federal trademark applications to register "Checker Car Club" and "Checker World."

50.    On February 9, 2017, Checker Car Club President Gary Lohsen sent a formal notice to Defendant via email demanding that Defendant immediately (1) stop using the infringing name and trademark CHECKER CAB CLUB, (2) abandon its fraudulent trademark registration CHECKER CAB CLUB, (3) transfer the <www.checkercabclub.org> domain to Checker Car Club; (4) delete the copycat Checker World Facebook Group; (5) remove all issues of Plaintiff's copyrighted newsletter, and (6) stop representing to third parties that it and not Plaintiff has superior rights to the "CHECKER CA* CLUB" marks.   A true and correct copy of the formal notice is attached hereto as Exhibit 26.

51.    On January 10, 2017 Defendant defiantly asserted his rights not only to his CHECKER CAB CLUB mark but to all CHECKER marks.  *See* Exhibit 27.  He then vowed to oppose Defendant's trademark applications, shut down Plaintiff's Website and Facebook Page, and to destroy Checker Car Club.  *See* Exhibit 27.

52.    On February 21, 2017, the USPTO initially refused Plaintiff's trademark applications. As a result, on February 22, 2017, Defendant sent an email to the Checker Car Club Board of Directors, wherein he threatened to soon start proceedings to shut down all of the club's web and Facebook activities.  *See* Exhibit 28.

53.    Defendant has been engaging in the above-described infringing activities knowingly and intentionally, with reckless disregard or willful blindness to Plaintiff's rights, or with bad faith, for the purpose of trading on the goodwill and reputation of Plaintiff and the Checker Car Club Marks.

54.    As a former long-time member, Vice President, and President of Checker Car Club, Defendant Fay was intimately aware of the strength of the Checker Car Club Marks and the incalculable goodwill associated therewith.

55.     Checker Car Club never gave Defendants Checker Cab Club and Joseph Fay any license, authority, or other permission to use the Checker Car Club Marks or any marks confusingly similar thereto (including and especially "Checker Cab Club") in connection with the advertising, promotion, selling and/or offering for sale of competing or related Checker car enthusiast club services.

56.     Defendant's activities, as described above, have and are likely to continue to create a false impression and deceive consumers, the public, and the trade into believing that there is a connection or association between Plaintiff's organization and services and Defendant's organization and services.   Indeed, Defendant has not only vowed to continue using his infringing mark and operating his infringing website and Facebook Page, he also has vowed to do everything he could to shut down Plaintiff's website and Facebook Page.

57.     Plaintiff is suffering irreparable injury as a result of Defendants' conduct, and has no adequate remedy at law.   Specifically, Defendant's unlawful conduct has caused and will continue to cause Plaintiff to lose members, lose membership fees, lose advertising revenue from selling advertisement space in its newsletters, lose online traffic to its website and Facebook Page, lose the source-identifying function and goodwill of its Checker Car Club Marks, and lose the value of its copyrighted newsletters.

## COUNT I
## Unfair Competition, 15 U.S.C. § 1125(a)

58.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1–57.

59.     Plaintiff, by virtue of nearly four decades of continuous and substantially exclusive nationwide use of the Checker Car Club Marks in interstate commerce, is the common-law owner of the Checker Car Club Marks for use in connection with club-related services, including the provision of a quarterly newsletter, the administration of discount purchasing programs, the

organization of car-part information exchanges, the provision of a website and online information about cars, the organization of local chapters, and the organization of exclusive events, such as car shows, museum tours, and an annual convention.

60.    The Checker Car Club Marks are inherently distinctive. If they were ever not distinctive, the Checker Car Club Marks acquired distinctiveness well before 2004 through Plaintiff's decades of continuous and substantially exclusive use.

61.    Without Plaintiff's authorization, sometime in late 2015 or early 2016 Defendant began using virtually identical service marks ("CHECKER CAB CLUB" vs. Plaintiff's "CHECKER CAR CLUB" and "CHECKER WORLD" & Design vs. Plaintiff's "CHECKER WORLD" and Design) in connection with the exact same services (club-related services for Checker automobile enthusiasts).

62.    Defendant purposefully chose the names "CHECKER CAB CLUB" and "CHECKER WORLD" due to their virtual identity with Plaintiff's widely known and recognized CHECKER WORLD and Checker Car Club Marks.

63.    Defendant has purposefully and unfairly interfered with Plaintiff's business and purloined its members by (1) copying its word mark and separate logo design; (2) fraudulently registering a virtually identical federal service mark in connection with identical services; (3) registering and using infringing domain names, such as <www.checkercabclub.org>; (4) creating and using infringing social media accounts, such as Checker Cab Club Facebook Group and Checker World Facebook Group; (5) posting messages on his Facebook Page advertising to third parties that his group provides Plaintiff's exclusive newsletters for free; (6) providing Plaintiff's copyrighted newsletters for free on its website; (7) sending knowingly false complaints to Google, Inc. and Facebook, Inc. in order to shut down Plaintiff's Website and Facebook Page

and in fact shutting them down; (8) posting false and defamatory statements online; and (9) sending threatening email and letters to Plaintiff and its officers.

64.     Defendant's promotion, advertising, and provision of his infringing services under the CHECKER CAB CLUB and CHECKER WORLD marks, as well as other unfair competitive conduct, has caused and is likely to continue cause confusion among the consuming public as to the origin, source, sponsorship, or affiliation of its services, and has caused and likely will continue to cause a false designation of origin such that the consumers believe in error that the Defendant's services have been authorized, sponsored, approved, endorsed, or licensed by Plaintiff, or that Defendant is in some way affiliated with Plaintiff.

65.     The foregoing acts are in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).  Indeed, Defendant's communications and actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill and commercial magnetism associated with the Checker Car Club Marks and CHECKER WORLD mark to the great and irreparable injury of Plaintiff.

66.     Defendant has made clear that he intends to continue to advertise and offer his services under the infringing mark and otherwise continue his unfair and unlawful actions unless restrained by this Court.

67.     Defendant has also made clear that he intends to prevent Plaintiff from the rightful use of its Checker Car Club Marks and CHECKER WORLD mark.

68.     As a result of Defendant's acts, Plaintiff has lost members, membership fees, and has been forced to spend hundreds of hours and spend thousands of dollars to respond to Defendant's harmful conduct.

69.     Defendant's acts have caused damages and will continue to damage Plaintiff, and Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant as follows:

(a) Permanent injunctive relief against Defendant, enjoining him from using the CHECKER CAB CLUB mark and checker flag logo; enjoining him from using the CHECKER WORLD mark; mandating that he immediately shut down the Checker Cab Club Facebook Page; and mandating that he immediately shut down the Checker World Facebook Page;

(b) Defendant's damages associated with Plaintiff's infringement, in an amount to be determined at trial, but in no event less than $100,000;

(c) Plaintiff's cost and reasonable attorneys' fees in the Court's discretion;

(d) Both pre-judgment and post-judgment interest; and

(e) Such other and further relief as this Court finds just and equitable.

## COUNT II
## Fraudulent Registration, 15 U.S.C. § 1120

70.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1–69.

71.     First, on December 11, 2015, Defendant represented in a signed Declaration to the USPTO that he had used the mark CHECKER CAB CLUB in connection with "[o]rganizing chapters of a taxi cab club and promoting the interests of the members thereof" and "[p]romoting the interests of people involved and concerned with historical taxi cabpreservation [*sic*]," in interstate commerce, since at least as early as November 19, 2008.

72.     Defendant did not begin using the phrase CHECKER CAB CLUB at all until 2015

73.     More importantly, Defendant did not begin using the phrase and service mark CHECKER CAB CLUB in connection with any commercial service, in interstate commerce, until July of 2016.

74.     Therefore, when Defendant submitted its signed Declaration to the United States Patent and Trademark Office ("USPTO") on December 11, 2015, attesting to the validity of the information in his application, such material information was knowingly false.

75.     Second, in its application, Defendant purposely failed to disclose to the USPTO the existence of the original Checker Motors Corporation or Plaintiff's CHECKER CAR CLUB, CHECKER CAR CLUB OF AMERICA, and CHECKER WORLD marks.

76.     Defendant, a former member and President of Checker Car Club, was well aware of Plaintiff's use of the Checker Car Club Marks and of the goodwill associated therewith well before Defendant submitted his application to the USPTO.

77.     Therefore, when Defendant submitted its Declaration to the USPTO on December 11, 2015, alleging that to the best of its belief, no other person, firm, corporation, or association, had the right to use an identical or confusingly similar mark in commerce, such attestations to material facts were knowingly false.

78.     Third, on July 1, 2016, Defendant signed an Office action response that stated he had used the CHECKER CAB CLUB mark "[a]t least as early as 11/19/2008" and that the new specimen that he submitted with the Office action response "was/were in use in commerce at least as early as the filing date of the application" when Defendant knew that both of these statements were false since Defendant he did not began using "Checker Cab Club" until he launched his website in late 2015 or early 2016 and did not use the specimen he submitted to the USPTO until he altered his website in response to the USPTO's June 30, 2016 Office Action.

79.     Defendant intended to deceive and did deceive the USPTO in order to register his infringing service mark—a registration he received on October 25, 2016.

80.     Since Defendant fraudulently registered its mark, he has used the registration to prevent Plaintiff from legitimately using its nearly four-decade only mark. Specifically, Defendant has used his registration to shut down Plaintiff's Facebook Page and to harass and intimate Plaintiff's officers and members.

81.     Unless cancelled, Defendant's registration will continue to damage Plaintiff.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant that includes the following:

(a) Cancellation of Registration No. 5067311;

(b) Damages to Plaintiff, in an amount to be determined at trial, but in no event less than $25,000;

(c) Costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(d) Both pre-judgment and post-judgment interest; and,

(e) Such other and further relief as this Court finds just and equitable.

## COUNT III
## Violation of Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)

82.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-81.

83.     Plaintiff acquired well-recognized and national rights in the Checker Car Club Marks for decades before Defendant registered <www.checkercabclub.org> ("the Infringing Domain").

84.     Defendant knew Plaintiff used and built up substantial goodwill in the Checker Car Club Marks for decades prior to his bad-faith registration of the Infringing Domain.

85.     Defendant registered the Infringing Domain name in bad faith and for no legitimate purpose.

86.     Defendant registered the Infringing Domain to profit from and unfairly trade off of the goodwill of the Checker Car Club Marks in violation of 15 U.S.C. § 1125(d).

87.     Defendant did not have Plaintiff's authorization to register the Infringing Domain.

88.     Defendant's use of the domain name has confused consumers and has caused Plaintiff to lose members and membership fees.

89.     Defendants' conduct has caused and will continue to cause irreparable harm to Plaintiff, for which there is no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant that includes the following:

(a) Immediate transfer of the <www.checkercabclub.org> to Plaintiff;

(b) Damages to Plaintiff, in an amount to be determined at trial, but in no event less than $25,000;

(c) Plaintiff's costs, attorney's fees, investigatory fees, and expenses to the full extent provided by applicable law;

(d) Both pre-judgment and post-judgment interest; and,

(e) Such other and further relief as this Court finds just and equitable.

**COUNT IV**
**<u>Violation of Uniform Deceptive Trade Practices Act, 815 ILCS § 510 et seq.</u>**

90.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-89.

91.     Defendant's past and continued use of CHECKER CAB CLUB, the double-flag logo, and CHECKER WORLD & Design in connection with his services, as well as his continued attempts

to prevent Plaintiff's use of the CHECKER CAR CLUB Marks, constitute unfair competition in violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510/1 et seq.).

92.     Defendant's acts intended to cause, have caused, and are likely to continue to cause confusion, mistake, and deception among consumers, the public and the trade as to whether Defendant's infringing services originate from, or are affiliated with, sponsored, or endorsed by Plaintiff.

93.     Defendant has made and will continue to make profits and/or gains to which he is not in law or equity entitled.

94.     Defendant intends to continue advertisement and sale of its infringing services and otherwise engage in deceptive trade practices unless restrained by this Court.

95.     Defendant's acts have damaged and will continue to damage Plaintiff and Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in favor of Plaintiff and against Defendant that includes the following:

(a) Permanent injunctive relief against Defendant, enjoining him from using the CHECKER CAB CLUB mark and checker flag logo; enjoining him from using the CHECKER WORLD mark; mandating that he shut down the Checker Cab Club Facebook Page; and, mandating that he shut down the Checker World Facebook Page;

(b) Damages in an amount to be determined at trial, but in no event less than $100,000;

(c) Plaintiff's costs, attorney fees, investigatory fees, and expenses to the full extent provided by applicable law;

(d) Both pre-judgment and post-judgment interest; and,

(e) Such other and further relief as this Court finds just and equitable.

19

## <u>COUNT V</u>
## <u>Tortious Interference with a Business Expectancy (Illinois Common Law)</u>

96.     Plaintiff hereby incorporates by reference the allegations set forth in Paragraphs 1-95.

97.     Plaintiff had ongoing contractual relations with its members and was reasonably likely to enter into contracts with those members and other potential members.

98.     Defendant was well-aware of Plaintiff's present and reasonably likely business expectancy with these members and potential members.

99.     Defendant intentionally and unlawfully interfered with Plaintiff's business expectancy by, among other things, advertising to third parties that Defendant provides (an actually providing) Plaintiff's past and future copyrighted newsletters for free and by offering identical services under marks virtually identical to Plaintiff's marks through a virtually identical domain name.

100.     With reasonably certainty, but for Defendant's conduct and statements, Plaintiff's business expectancy would have been realized and it would have not lost members or membership fees.

101.     Defendant's interference was done purposefully, intentionally, and willfully, such that current and many prospective members of Plaintiff's organization were unfairly dissuaded from joining or remaining in the organization.  As a result, Defendant intended to and did interfere with Plaintiff's business expectancy.

102.     Plaintiff has lost and will continue to lose members, fees, and goodwill as a direct and proximate result of Defendant's tortious conduct.  Plaintiff has no remedy at law.

WHEREFORE, Plaintiff prays that this Honorable Court enter an order and judgment in its favor and against Defendant including, but not limited to, the following relief:

(a) Permanent injunctive relief against Defendant, enjoining him from using the CHECKER CAB CLUB mark and checker flag logo; using the CHECKER WORLD mark and design; operating or otherwise permitting the Checker Cab Club Facebook Page; operating or otherwise permitting the Checker World Facebook Page; uploading, reproducing, posting, or otherwise distributing Plaintiff's newsletters; and publishing false and defamatory statements about or concerning Plaintiff;

(b) Damages in an amount to be determined at trial but in no event less than $10,000;

(c) Disgorgement of Defendant's ill-gotten profits;

(d) Plaintiff's costs, attorney's fees, investigatory fees, and expenses to the full extent provided by applicable law;

(e) Both pre-judgment and post-judgment interest; and,

(f) Such other and further relief as this Court finds just and equitable.

### Demand for Trial by Jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff requests a trial by Jury in this matter.

Dated: March 9, 2017

Respectfully submitted,

/s/Daliah Saper
Daliah Saper
Saper Law Offices, LLC
505 N. LaSalle Suite 350
Chicago, Illinois 60654
Phone: (312) 527-4100
ARDC No.: 6283932
ds@saperlaw.com

Matthew R. Grothouse
Saper Law Offices, LLC
505 North LaSalle, Suite 350
Chicago, IL 60654

Phone: (312) 527-4100
ARDC No.: 6314834
matt@saperlaw.com