IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHECKER CAR CLUB OF AMERICA, )
INC., an Indiana corporation, )
                              )
        Plaintiff,             )
                              )
    v.                         )   No. 17 C 1865
                              )
JOSEPH FAY, an individual,    )
d/b/a CHECKER CAB CLUB,       )
                              )
        Defendant.             )
                              )

MEMORANDUM OPINION AND ORDER

Plaintiff Checker Car Club of America, Inc. ("Checker Car Club" or "plaintiff"), has sued one of its former members, Joseph Fay ("Fay" or "defendant"), asserting claims for: (1) Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a); (2) Fraudulent Registration of a Trademark, 15 U.S.C. § 1120; (3) violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (4) violation of the Uniform Deceptive Trade Practices Act, 815 ILCS § 510 *et seq.*; and (5) Tortious Interference with a Business Expectancy under Illinois law. Plaintiff has moved for a temporary restraining order ("TRO") and a preliminary injunction forbidding defendant's use of its trademarks. For the reasons below, plaintiff's motion for a TRO is denied. Plaintiff's motion for a preliminary injunction is referred to the assigned magistrate judge.

I.

The Checker Car Club was founded in 1982, after Checker Motors Corporation discontinued production of its "Checker" automobiles. The club's purpose was to promote "the preservation, enjoyment, and exchange of information about Checker automobiles." Compl. ¶ 9.[1] Since 1984, plaintiff has published a quarterly newsletter for its members. Plaintiff also has provided services for its members, including administering discount purchasing programs and facilitating car-part information exchanges. Plaintiff also organizes social events, including car shows and conventions. Plaintiff claims that it has used the CHECKER CAR CLUB OF AMERICA and CHECKER CAR CLUB marks in providing these services, and that it has used the CHECKERBOARD NEWS mark in connection with its newsletters.

Defendant is a former member of the Checker Car Club. At one point, he served as the club's president and as one of its directors. In 2008, he created a Facebook group called the "Facebook Checker Cab Group." Plaintiff acknowledges that it gave defendant permission to create the page.

---

[1] The current membership fee is $25 per year.

In 2014, plaintiff decided to create a new website and Facebook Page.[2] Initially, there was some talk of using the Facebook Checker Cab Group page created by defendant. At some point, however, relations with defendant soured, ultimately leading to his expulsion from the Checker Car Club in July 2015. On June 27, 2015, plaintiff launched its new website <www.checkerworld.org> and a Facebook Page entitled "Checker World."

The following month, however, defendant registered the domain name <www.checkercabclub.org>. In addition, defendant later obtained a federal trademark registration for the mark CHECKER CAB CLUB. According to plaintiff, defendant procured the trademark by making false statements to the U.S. Patent and Trademark Office (USPTO).

Since that time, plaintiff alleges that defendant has embarked on a campaign to destroy it. According to the complaint, in September 2015, defendant "fabricated copyright claims" against plaintiff and succeeded in temporarily shutting down plaintiff's website. And in October 2016, defendant used his registration for CHECKER CAB CLUB to temporarily shut down plaintiff's "Checker World" Facebook Page, which he subsequently replaced with an virtually identical "Checker World" Facebook

---

[2] Plaintiff created a first website in 2004 at the URL <www.checkertaxistand.com>.

group of his own. In addition, plaintiff alleges that, despite its specific instructions not to do so, defendant downloaded past versions of its newsletter, which he displayed and distributed on his website for free.

Plaintiffs have moved for a TRO: (1) enjoining defendant from using the CHECKER CAB CLUB, CHECKER WORLD, and the CHECKERBOARD NEWS marks; (2) requiring defendant to shut down his CHECKER WORLD Facebook Page, his Checker Cab Club Facebook Page, and his <checkercabclub.org> domain name; (3) enjoining defendant from undermining their website and social media accounts by filing copyright or trademark-related complaints; and (4) enjoining defendant from reproducing, publicly displaying, and distributing plaintiff's trademarked newsletters.[3] Defendant filed a brief in opposition to plaintiff's motion and a hearing on the motion was held the following day.

## II.

---

[3] I note that while the plaintiff requests that defendant's Checker Cab Club Facebook Page be disabled, plaintiff elsewhere states that defendant "will be able to continue to operate his Checker automobile organization using his original Facebook group," and that he "will just be enjoined only from engaging in his recent unlawful conduct." Pl.'s Br. at 13. In addition, in the introduction to its brief, plaintiff asserts that it seeks to enjoin defendant's "false and disparaging comments about Plaintiff and its members and officers." Pl.'s Br. at 1. However, that request is omitted from the formal statement of the relief sought at the conclusion of the brief.

A temporary restraining order "is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008) (citing *Goodman v. Illinois Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). A TRO "is warranted if the movant can make a threshold showing: (1) that the movant has some likelihood of success on the merits of the underlying litigation; (2) irreparable harm to the plaintiff; and (3) no adequate remedy at law exists." *Illusions Too Reality, LLC v. City of Harvey*, No. 02 C 7272, 2003 WL 260335, at *4 (N.D. Ill. Feb. 4, 2003). "If these three conditions are met, then the Court must balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is issued improvidently and consider the interest of the public in whether the injunction is to be granted or denied." *Id*.

**A.   Likelihood of Success on the Merits**

To show a likelihood of success on the merits, the moving party must show a "'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008). The parties have focused chiefly on plaintiff's unfair competition claim under the Lanham Act (Count I) and its fraudulent trademark registration claim

(Count II). I conclude that plaintiff has established a better-than-negligible chance of success on both claims.

1. **Infringement Under the Lanham Act**

"[T]o prove a claim pursuant to 15 U.S.C. § 1125(a), a plaintiff must show (1) that its trademark may be protected and (2) that the relevant group of buyers is likely to confuse the alleged infringer's products or services with those of plaintiff." *H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 759–60 (7th Cir. 2007) (quotation marks omitted).

a. **Protection of the Marks**

It is undisputed that the CHECKER CAR CLUB, CHECKER CAR CLUB OF AMERICA, and CHECKER WORLD marks are not registered.[4] "When the identifying word, term, name, symbol or device claimed as a trade name or mark is not registered with the United States Patent and Trademark Office, the burden is on the claimant ... to establish that it is entitled to protection under § 43(a) of the Lanham Act." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). "In general, the level of trademark protection available corresponds to the distinctiveness of the mark." *Id.* at 727. Plaintiff asserts that the marks are either inherently distinctive or have become

---

[4] In January, 2017, plaintiff applied for registrations for the marks CHECKER CAR CLUB and CHECKER WORLD marks. In February 2017, the USPTO initially rejected the applications, Compl. ¶ 52, apparently on the ground that the marks were merely descriptive, *see* Tr. at 33-34.

6

distinctive through use. However, plaintiff provides no argument or evidence to support its claim of inherent distinctiveness. Thus, plaintiff's claim hinges on its ability to show that the marks have become distinctive through use.

"To prove infringement of a trademark that is not inherently distinctive, a plaintiff must establish that its mark acquired secondary meaning before the alleged infringer first began using the allegedly infringing mark." *WMH Tool Grp., Inc. v. Woodstock Int'l, Inc.,* No. 07-CV-3885, 2009 WL 6825247, at *5 (N.D. Ill. Dec. 9, 2009). "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the word, term, name, symbol, or device has come to mean that those products or services are the company's trademark." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 728 (7th Cir. 1998). "To establish secondary meaning, a court may consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Id*.

Here, plaintiff bases its argument on the length and manner of its use of the marks. It has offered the testimony and affidavit of its president, Jim Garrison ("Garrison"), and the

affidavit of Mark Lohsen ("Lohsen"), a current member of the Checker Car Club's board of directors. The testimony of these witnesses, along with the accompanying exhibits, supports plaintiff's claim that it has used the CHECKER CAR CLUB and CHECKER CAR CLUB OF AMERICA marks since 1984, and that the club has been mentioned in the media over the years. As a result, plaintiff has established a more-than-negligible chance of showing that these marks have acquired secondary meaning and are protected for purposes of its unfair competition claim. However, plaintiff has not provided sufficient evidence to indicate that it used the CHECKER WORLD mark with any regularity prior to 2015, when it launched its revamped website. For purposes of this motion, therefore, plaintiff has not shown that the CHECKER WORLD mark has acquired a secondary meaning and thus has failed to show that the mark is protectable.

  b. **Likelihood of Confusion**

In determining whether there is a likelihood of confusion between the marks, "a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (quotation marks omitted). "Possible confusion is not enough; rather, confusion must be 'probable.'" *Id*. (quotation marks omitted). The Seventh Circuit uses "seven factors to determine the likelihood of

confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another." *Id.* While none of these factors is dispositive, the Seventh Circuit has stated that the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important. *Id.*

Many of these factors support a finding that confusion between the marks is likely: the CHECKER CAR CLUB and CHECKER CAB CLUB marks are highly similar; the marks are used in connection with the same services (i.e., promotion of interest in, and activities related to, Checker automobiles); and their area and manner of use appears similar (e.g., both are used primarily in connection with online activity). In addition, based on the discussion in the previous section, the plaintiff's CHECKER CAR CLUB and CHECKER CAR CLUB of AMERICA marks can be considered relatively strong.[5]

On the other hand, plaintiff has provided little evidence of actual confusion. Garrison was questioned on this point

---

[5] Neither party has made a compelling argument as to the degree of care likely to be used by consumers.

9

during the hearing, but his testimony was highly speculative. He surmised that about a quarter of the plaintiff's membership "has not been able to decipher what's different" between the two groups. Hr'g Tr. at 46. But the basis for this estimate was not clear. He cited only one example of actual confusion, involving an individual named James Hoyt Wood ("Wood") in March 2015. According to Garrison, Wood contacted him and the Checker Car Club's treasurer after witnessing an unpleasant exchange involving defendant on defendant's Facebook Checker Cab Group Page. Tr. at 60. Garrison testified that Wood was under the incorrect impression that the two groups were the same and/or affiliated. *Id*. In this instance, however, the confusion was between Checker Car Club and defendant's "Facebook Checker Cab Group," not defendant's CHECKER CAB CLUB mark. Plaintiff does not allege that "Facebook Checker Cab Group" is confusingly similar to CHECKER CAR CLUB. Indeed, plaintiff's decision to allow defendant to use "Facebook Checker Cab Group" in 2008 was based on its judgment that the "Group was sufficiently different from the CHECKER CAR CLUB and CHECKER CAR CLUB OF AMERICA marks." Compl. ¶ 23. The incident may therefore be more indicative of Wood's susceptibility to confusion than of a likelihood of confusion between the CHECKER CAR CLUB and CHECKER CAB CLUB marks.

Evidence as to defendant's intent also does not suggest a likelihood of confusion. Garrison's testimony indicates that defendant has in fact made considerable efforts to distinguish his club from plaintiff's. For example, he has included a disclaimer on his website's homepage stating: "We are not associated with the Checker Car Club of America." *See* http://checkercabclub.org/.[6] In addition, Garrison testified that defendant has a policy of forbidding members of his club from cross-posting on plaintiff's website and/or Facebook Page. Thus, anyone who posts on plaintiff's website is banned from defendant's group.

While the evidence is mixed, I find that when all of the factors are considered together, plaintiff has made a sufficient showing that there is a likelihood of confusion between the marks. Having also shown a protectable right in the CHECKER CAR CLUB and CHECKER CAR CLUB OF AMERICA marks, I conclude that plaintiff has shown a non-negligible chance of succeeding on the merits of its infringement claim.

**2. Fraudulent Procurement**

"A claim for fraudulent procurement of a trademark requires: "(1) [a] false representation regarding a material fact; (2) the registrant's knowledge or belief that the

---

[6] The record does not indicate when defendant began displaying the disclaimer.

11

representation is false; (3) the intention to induce action or refrain from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance." *Slep-Tone Entm't Corp. v. Elwood Enterprises, Inc*., 165 F. Supp. 3d 705, 710 (N.D. Ill. 2015) (quotation marks omitted).

Plaintiff alleges that defendant made a number of false representations to the USPTO in obtaining registration for his CHECKER CAB CLUB mark. For example, plaintiff alleges that defendant falsely told the USPTO that he had used the CHECKER CAB CLUB mark in interstate commerce since November 19, 2008. According to plaintiffs, defendant began using the mark only in 2015 and did not begin using the mark commercially until late 2015 or early 2016, after launching his website. Plaintiff also alleges that defendant falsely stated in his application to the USPTO that "no other person, firm, corporation, or association, had the right to use an identical or confusingly similar mark in commerce." According to plaintiff, this was false because defendant was aware of plaintiff's use of the CHECKER CAR CLUB and CHECKER CAR CLUB OF AMERICA marks.

Defendant has not attempted to rebut these contentions. Instead, he argues that Count II fails because, based on his arguments in connection with Count I, plaintiff's marks are not legally protected. Having concluded that plaintiff has made a

sufficient showing that its marks are legally protected, this response fails. Based on the spare record before me, therefore, plaintiff has shown a likelihood of success as to its fraudulent registration claim.

**B.    Irreparable Harm**

A party seeking a TRO must show that, absent an injuction, irreparable harm is not merely possible but likely. *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.") (citations omitted). Plaintiff alleges that it will suffer irreparable harm of various sorts, but its argument ultimately rests on alleged harm to its goodwill.

As plaintiff correctly observes, such harm is considered presumptively irreparable in trademark infringement actions. *See, e.g., Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 887 (N.D. Ill. 2008). However, the presumption of irreparability is negated where the plaintiff has delayed in enforcing its rights. *See, e.g., id.* ("Damages suffered as a result of trademark infringement are presumed to be irreparable because it is nearly impossible to calculate the precise economic harm caused by damage to goodwill and reputation on account of such infringement. However, where a

13

plaintiff inexcusably delays in moving for a preliminary injunction, this presumption may cease to exist as a court may infer from the delay that there is no actual threat of irreparable harm.") (citation omitted). Here, plaintiff has been aware of defendant's alleged infringing conduct for more than a year. According to the complaint, defendant temporarily shut down plaintiff's website in September 2015 and its Facebook Page in October 2016. The complaint also specifically alleges that plaintiff contemplated taking legal measures against defendant as far back as November 2015.

Given this delay in taking action, plaintiff's claim of irreparable harm is unpersuasive. *See, e.g.*, *MB Fin. Bank, N.A. v. MB Real Estate Servs., L.L.C.*, No. 02 C 5925, 2003 WL 22765022, at *8 (N.D. Ill. Nov. 21, 2003) (presumption of irreparable harm rebutted in light of ten-month delay in seeking preliminary injunction); *Borden, Inc. v. Kraft, Inc.*, No. 84 C 5295, 1984 WL 1458, at *16 (N.D. Ill. Sept. 28, 1984) (five-month delay defeated request for preliminary injunction).

During the hearing, plaintiff argued that it has decided to seek injunctive relief at this time because the defendant's conduct has recently begun to escalate. *See* Tr. at 4 ("True, that this dispute started in late 2015. But the activity has escalated, particularly when it comes to defendant's registration of the mark, which happened just a few months ago.

And defendant's use of that registration just a few months ago to shut down plaintiff's Facebook page."). However, defense counsel has represented that defendant will not object to, or threaten to take down, plaintiff's website or Facebook page, and that he will not represent to third parties that he has the exclusive rights to the CHECKER CAR CLUB mark. *See* Tr. at 74; *see also* Tr. at 29. (Although defense counsel did not specify a timeframe, I understand defendant to have agreed to refrain from engaging in these actions at least until the plaintiff's motion for a preliminary injunction is resolved).

Thus, even assuming that defendant's conduct has indeed escalated in recent weeks, defendant's voluntary cessation effectively addresses this concern. Indeed, during the hearing, plaintiff's counsel agreed that the defendant's stipulation addressed plaintiff's concerns except those relating to defendant's alleged fraudulent procurement of the marks. Tr. at 75 ("It solves many of the issues of the -- the one issue it doesn't solve is the fact that they have this fraudulently procured registration."); *see also* Tr. at 75. The latter issue, however, goes to the merits of plaintiff's claims, not to the question of irreparable harm, and cannot be appropriately adjudicated in the context of a TRO.[7]

---

[7] Having concluded that Checker Car Club has failed to make a showing of irreparable harm, I need not consider the other

In addition to seeking to enjoin defendant's use of the disputed marks, plaintiff also seeks to enjoin defendant's reproduction and distribution of plaintiff's newsletters. The parties devoted comparatively little attention to this issue at the hearing. Plaintiff's counsel stated that defendant had previously indicated a willingness to take the newsletters down. *See* Tr. at 16. However, there was no representation from defendant's counsel on this point. In any case, plaintiff has failed to make the necessary showing for the injunctive relief it seeks with respect to the newsletters. There are factual disputes over whether defendant was given permission to post the newsletters and whether the newsletters are protected by copyright. Plaintiff has also failed to show a likelihood of irreparable harm based on defendant's use of the newsletters. Plaintiff has offered no concrete evidence of harm in connection with the newsletters, and as with defendant's use of the marks, plaintiff has delayed in taking any action despite the fact that defendant has been making the newsletters available on his site since October 2015.

For these reasons, I conclude that plaintiff has failed to show that it is likely to suffer irreparable harm in the absence of a temporary restraining order. While I deny plaintiff's

---

prongs of the standard. *See, e.g.*, *Left Field Media LLC v. City of Chicago*, 137 F. Supp. 3d 1127, 1142 (N.D. Ill. 2015).

motion for a TRO, however, I emphasize that my ruling is based on the limited factual record before me, and I express no opinion as to whether, after the parties have had an opportunity to provide additional evidence and briefing, plaintiff is likely to succeed on its motion for a preliminary injunction.

## C. Plaintiff's Motion to Supplement

Shortly before this opinion was issued, plaintiff filed a motion to supplement the record for purposes of its TRO motion. Attached to the motion are two messages received by plaintiff in which consumers exhibit confusion between the Checker Car Club and the Checker Cab Club. While this may further strengthen plaintiff's case, it does not affect my ruling, for I have already concluded for purposes of this motion that plaintiff has sufficiently shown a likelihood of confusion between the marks.

Another exhibit to the motion consists of a printout of what appears to be a Facebook post by defendant containing a Checker logo accompanied by text stating, "The Checker Logo, a Sign of Quality by Joe Fay – Checker Cab Club." The date of the post is unclear. According to plaintiff, this shows that "as Checker Car Club feared, Defendant Fay is broadcasting to third parties that he has rights to his infringing trademarks." Motion to Supplement at 5. At this stage, however, the parties' rights with respect to the logo are unclear. The parties' briefs do not address this issue in depth. And at the hearing, Garrison

testified that the logo in question was essentially the same as the one used by Checker Motors Corporation.

Finally, plaintiff has submitted what appears to be a Facebook post by the defendant dated March 3, 2017 in which he "told consumers that they should go to his group for the newsletter because he gives them away for free." *Id*. at 5 [sic]. This, too, does not affect my ruling because the record already contains evidence that defendant has made plaintiff's newsletters available for free.

Accordingly, I deny plaintiff's motion to supplement as moot. I reiterate, however, that even taking account of plaintiff's supplemental evidence, the record before me remains limited, and that plaintiff may submit additional evidence in support of its motion for a preliminary injunction, which I refer to the assigned magistrate judge.

## Conclusion

For the reasons discussed above, plaintiff's motion for a temporary restraining order is denied and plaintiff's motion for a preliminary injunction is referred to the assigned magistrate judge.

**ENTER ORDER:**

*[signature]*

**Elaine E. Bucklo**

Dated: March 22, 2017  United States District Judge